FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 5 - 2013 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CHARLOTTE MYERS,

        Plaintiff,

- against -

STATE OF NEW YORK – DEPARTMENT
OF MOTOR VEHICLES; BARRY
WULKAN; KATHLEEN SULLIVAN;
DOES 1-10,

        Defendants.
-----------------------------------------------------------x

<u>OPINION & ORDER</u>

No. 06-cv-4583 (NG) (VMS)

NINA GERSHON, United States District Judge:

Defendants the New York State Department of Motor Vehicles ("DMV"), Barry Wulkan, and Kathleen Sullivan move under Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing plaintiff Charlotte Myers's claims under Title VII, 42 U.S.C. §§ 1981 and 1983, the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and New York State and New York City antidiscrimination laws. For the reasons explained below, defendants' motion for summary judgment is granted.

I.    BACKGROUND

Unless otherwise noted, the following facts are not in dispute.

Plaintiff Charlotte Myers began working at the DMV as a telephone operator in 1987, and, in 1990, was promoted to Motor Vehicle Representative ("MVR") in one of the DMV's Traffic Violations Bureaus ("TVB"). As an MVR, she had three primary duties related to certain kinds of non-criminal moving violations: working as an information counter clerk, hearing room clerk, or after-hearing cashier. In general, MVRs rotate between these duties in response to the

daily needs of the office, and, as their job description states, they have "substantial contact with members of the public seeking services or information."

On December 19, 2000, plaintiff filed a charge of discrimination based on disability and religion with the New York State Division of Human Rights ("NYSDHR"). On March 27, 2001, plaintiff filed another charge with the NYSDHR, this time alleging retaliation following her December 19 charge. Both charges were dismissed.

In September 2001, plaintiff was working in the Manhattan South TVB on a part-time schedule of 20 hours per week. Plaintiff was absent on medical leave from September 5, 2001 until October 8, 2001. During her absence, the World Trade Center was attacked, and plaintiff was transferred to the Brooklyn North TVB, an assignment that became permanent in March 2002. During the time she was at Brooklyn North TVB, plaintiff was supervised by Barry Wulkan, who, in turn, reported to Administrative Law Judge ("ALJ") Alan Gelbstein, among others.

After transferring to Brooklyn, plaintiff continued on a part-time schedule, with duties limited to working as an after-hearing cashier and in the hearing rooms. Plaintiff claims that her part-time, limited duty schedule was necessitated by the stress she experienced if she had to interact with the public and work full-time. Shortly after she began at Brooklyn North TVB, ALJ Gelbstein told Mr. Wulkan that, in light of plaintiff's part-time schedule, the needs of the office would best be served if she was assigned to work only in the hearing room.[1]

---

[1] The parties dispute whether this schedule was available to plaintiff as a reasonable accommodation of a claimed disability or otherwise, but this dispute is not material to the resolution of this motion.

Plaintiff submitted no medical documentation to support a part-time schedule between October 2001 and March 2003, when she submitted a doctor's note that supported a three-month long reduction in her workload.

Plaintiff received initial notice that her schedule and duties would change in August 2004, when Mr. Wulkan told her that she might be required to resume working on occasion as an after-hearing cashier unless she provided the DMV with documentation of a continuing medical need for restricted work duties. Despite several reminders, plaintiff failed to submit any such medical documentation.

On September 1, 2004, plaintiff and Mr. Wulkan had a verbal altercation involving a postage machine. According to plaintiff, Mr. Wulkan accused her of leaving the machine on and singled her out for reprimand because of her race. Defendants, relying on Mr. Wulkan's declaration, assert that Mr. Wulkan

> made a general statement to the staff who were present asking who had used the meter last. There was no response, therefore, not knowing whether I had been heard or the staff were simply avoiding answering the question, I decided to ask each person present individually. Plaintiff was sitting at the desk closest to me, so I started with her. I asked if she was the last one to use the meter. If she had said no, I would have simply moved on to the next person. If she had said yes, I would have reiterated the office policy about setting the meter back to zero. However, plaintiff began shouting at me. I told plaintiff she had to leave the office since she has already finished her daily shift.

Wulkan Decl. ¶ 19.

Plaintiff asserts that, prior to the September 1, 2004 altercation, Mr. Wulkan made racist and sexist jokes almost every day. Susan Taubman, who also worked as one of plaintiff's supervisors, stated in a declaration that she heard Mr. Wulkan make numerous sexist and racist jokes as well as plaintiff's objections to him regarding the jokes on more than one occasion. However, other than plaintiff's statement that the jokes made her feel uncomfortable, the record

does not reflect the substance of the jokes themselves or any other details related to the jokes, such as whether they were directed at plaintiff. Plaintiff acknowledged that the jokes stopped after Mr. France became aware of the postage machine incident in October 2004.

Plaintiff was reprimanded on other occasions as well, although the parties dispute the reason for the reprimands. Plaintiff asserts that she was singled out because of her race and scrutinized more closely, which she characterized as a "nuisance," while defendants assert that the reprimands resulted from tardiness or absences from her work station and unauthorized use of office resources.

On September 15, 2004, Kristal Jones, plaintiff's direct supervisor,[2] notified plaintiff that she would "be put in rotation" on September 21, 2004, if no further medical documentation were received. Plaintiff submitted medical notes in support of her request for a modified work schedule on September 17, and 24, 2004, which were the first such notes submitted since March 2003. Plaintiff never resumed a full-time, full-duty schedule during the rest of her time with the DMV.

On October 8, 2004, plaintiff submitted a grievance related to the September 1, 2004, postage machine incident. The grievance noted that it was regarding Barry Wulkan, and stated: "Verbal abuse which has resulted in harassment and retaliation. A formal (verbally) complaint which went unresolved with management at Bklyn N. Retaliation which he clearly stated would take place."[3] She also filed, on the same day, a reasonable accommodation request with the

---

[2] Ms. Jones reported to Mr. Wulkan.

[3] The parties disagree about whether this grievance was properly submitted in accordance with DMV policies. This dispute is not material to the resolution of the motion, and this opinion assumes for present purposes that the grievance was sufficient to put defendants on notice that plaintiff was complaining about race-based discrimination.

DMV's Division of Labor Relations seeking permission to work only in the hearing rooms and back office in order to reduce stress.

On October 19, 2004, ALJ Sullivan succeeded ALJ Gelbstein, becoming Mr. Wulkan's supervisor. On October 21, plaintiff came to ALJ Sullivan's office to introduce herself. Plaintiff told her that she had a very ill mother, she herself had fibroids and that, because of this, her work hours and duties were limited. Plaintiff also reported that she was having problems with Mr. Wulkan and told ALJ Sullivan about the incident involving the postage machine. Plaintiff avers that she told ALJ Sullivan that Mr. Wulkan's behavior was racially motivated, but ALJ Sullivan stated in her deposition that "[a]t no time did plaintiff claim that Mr. Wulkan had discriminated against her on the basis of race or disability." ALJ Sullivan reported her conversation with plaintiff to Steve France, Director of Labor Relations,[4] and she also spoke to Mr. Wulkan about plaintiff's concerns.

Plaintiff contends that, after complaining to ALJ Sullivan, "Wulkan approached me and stated that he would show me that he can do worse to me than I can do to him, and that he would retaliate for me reporting him." Pl. Ex. 1 ¶13. In her view, "[f]rom that moment on things changed drastically at work." Id. ¶ 14. Specifically, she states that she was no longer allowed to work solely in the hearing room, but was put into "full rotation and made to work in the information counter, thus interacting with the public and worsening [her] disability." Id. ¶ 15. In addition, "Ms. Sullivan and Steve France joined Wulkan and engaged in a series of acts to inject hostility into the workplace for me, at one point taking away my reasonable accommodation and instructing me to work at 100% fulltime." Id. ¶ 16.

---

[4] From 2002 to 2005, Mr. France was the Assistant Director of Labor Relations.

On March 7, 2005, Mr. France denied plaintiff's October 8, 2004, request for a reasonable accommodation. Prior to issuing the denial, Mr. France sought to have plaintiff evaluated by the Employee Health Services ("EHS") of the Department of Civil Service to determine if "there is a medical basis" to accommodate her request for a reduced "work-related stressful environment." Plaintiff had been examined on January 13, 2005, and the DMV's examining physician determined that she needed to undergo a psychological evaluation "to determine if the cumulative stresses [which] she is presently reporting should be a reason to modify her current work situation." Plaintiff did not appear for either of the two scheduled psychological examinations. In denying the reasonable accommodation request, Mr. France stated that, because she failed to appear for the exams, his office was not able to determine the appropriateness of her reasonable accommodation request.

Plaintiff submitted three additional reasonable accommodation requests in July and August 2005, all of which were denied. In a letter dated September 2, 2005, Mr. France stated that plaintiff was expected to resume an unrestricted, full-time work schedule effective Thursday, September 8, 2005. Beginning on September 8, 2005, plaintiff took an extended leave of absence and ultimately remained out of the office for over a year.

Plaintiff filed a charge of discrimination and retaliation with the NYSDHR on September 12, 2005, which was later dismissed on April 24, 2006.

On September 14, 2005, plaintiff submitted another reasonable accommodation request, which indicated that she would be temporarily disabled between September 14 and September 30, 2005. By letter dated September 21, 2005, Mr. France denied the request on the ground that plaintiff would be on approved medical leave during that time as a result of medical documentation contained in her August 2, 2005 reasonable accommodation request.

On November 3, 2005,[5] plaintiff submitted another request seeking a reasonable accommodation to her schedule to allow her to work a part-time schedule, but did not request a limited-duty schedule. On June 5, 2006, following another EHS examination, Mr. France offered plaintiff her choice of several part-time schedules, but noted that she would be expected to perform all of her job duties. Although Mr. France's proposal mirrored plaintiff's request in terms of a part-time schedule with no limitation on duties, Plaintiff did not accept the proposed accommodation.

On August 24, 2006, plaintiff filed this lawsuit. She was terminated effective December 29, 2006, on the ground that she had been continuously absent from the office for over one year due to a non-occupational disability. ALJ Sullivan and Mr. Wulkan both retired from the DMV, in March 2007 and August 2010, respectively.

## II. DISCUSSION

Plaintiff currently pursues claims against New York State under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and claims against the individual defendants, in their official and individual capacities, under 42 U.S.C. § 1981, the FMLA, 29 U.S.C § 2601 *et seq.*, the ADA, 42 U.S.C. § 12111 *et seq.*, and the New York State and New York City Human Rights Laws.

In a letter dated September 20, 2010, plaintiff represented that the following claims were abandoned: (1) claims against the individual defendants under Title VII; (2) claims against the State of New York under 42 U.S.C. § 1981, the FMLA, the ADA, and New York State and New York City Human Rights Laws; and (3) all claims for tortious interference with contractual

---

[5] Although the parties treat this request as made on November 30, 2005, the date indicated on plaintiff's request is November 3, 2005.

7

relations. Those claims are therefore dismissed. Finally, plaintiff does not oppose the summary judgment motion with respect to defendants Does 1-10. Therefore, the claims against these defendants are also dismissed.

### a. Summary Judgment Standard

Summary judgment is appropriate where the "movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotations and emphasis removed).

### b. Title VII: Disparate Treatment

Title VII makes it an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

"A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004).

### i. Adverse Job Action

On a summary judgment motion, a plaintiff's claim that she suffered an adverse job action because of discrimination based on race brought under Title VII is analyzed under the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). First, the plaintiff has the burden of proving a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *Id.* Plaintiff's burden of proof at this threshold step is minimal. *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2000). Second, if the plaintiff successfully proves a *prima facie* case, a presumption of unlawful discrimination arises and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Third, if the defendant carries this burden, the plaintiff must then demonstrate that the proffered reason is in fact a pretext for intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). At all times, the ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff. *Burdine*, 450 U.S. at 253.

In New York, discrimination claims under Title VII must be filed with the Equal Employment Opportunity Commission ("EEOC") or the relevant state or local administrative agency within 300 days of the alleged unlawful act. 42 U.S.C. § 2000e-5(e)(1). "A claim is time barred if it is not filed within these time limits." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

Claims based on termination, failure to promote, denial of transfer, or refusal to hire must be filed within the 300-day period, even if other acts of discrimination occurred within the statutory time period. *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010). For example, in the context of discriminatory termination, the 300-day limit begins from the date upon which the employee receives a "definite notice of the termination, not upon his discharge." *Miller v. Int'l Telephone & Telegraph Corp.*, 755 F.2d 20, 23 (2d Cir. 1985). Thus, the "proper focus" for the court is "the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (emphasis in original). Where the discriminatory decision has been made and communicated to the employee, the "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980). In "[d]etermining the timeliness" of a plaintiff's EEOC filing, the court must "identify precisely the unlawful employment practice of which [the plaintiff] complains." *Id.* (internal quotation marks omitted).

Applying these principles here, plaintiff filed her complaint with NYSDHR on September 12, 2005, which makes Title VII claims time-barred with respect to discriminatory acts done

prior to November 16, 2004. At oral argument, plaintiff acknowledged that the modification of her schedule constituted the initial adverse job action. She received definite notice of this change on September 15, 2004, when she learned that she would begin a full-time, full-duty schedule on September 21, 2004, unless she submitted a doctor's note to support a reasonable accommodation.[6] Because notice of the modification to plaintiff's schedule occurred before November 16, 2004, this claim is time-barred.

Plaintiff's argument that the limitation period should be tolled because of defendants' failure to provide notice of her rights under federal or state discrimination laws is rejected. Assuming for the sake of argument that plaintiff's claims may be equitably tolled on this basis, *see Wei Hong Zheng v. Wong*, 2009 WL 2601313, *2 (E.D.N.Y. 2009); *but cf. AMS Group LLC v. J.P. Morgan Chase Bank*, 371 F. App'x. 149, 150 (2d Cir. 2010) (recognizing that equitable estoppel may prevent defendant from asserting limitations defense where defendant impeded timely filing), because plaintiff filed two prior discrimination complaints with the NYSDHR in 2000 and 2001, no reasonable jury would find that she did not have actual knowledge of her rights. *See, e.g., Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F. 3d 41, 48 (1st Cir. 2005) (showing required that plaintiff had no actual knowledge of rights). Furthermore, plaintiff's reliance on the continuing violations doctrine is misplaced, as that doctrine does not apply to claims in which a plaintiff must demonstrate that she suffered a discrete adverse job action. *Morgan*, 536 U.S. at 114.

---

[6] That she submitted a medical note on September 17, 2004, does nothing to undermine the definiteness of the September 15 notice. If anything, the September 17 medical note highlights her belief that the September 15 notice set a firm deadline, since the September 17 medical note was the first such note submitted since March 2003.

Likewise, she apparently never resumed a full-time, full-duty schedule, but that does not alter the conclusion that she received definite notice of the imminent change on September 15.

11

Turning to the merits regarding the two other adverse job actions plaintiff identifies—the March 7, 2005 reasonable accommodation denial and the December 26, 2006 termination—those claims cannot withstand the summary judgment motion. There is insufficient evidence that either of these decisions were based on race or otherwise infected by Mr. Wulkan's alleged racial animus. Plaintiff does not contend that Mr. Wulkan made the decision to deny the reasonable accommodation request or terminate plaintiff's employment. Notably, plaintiff conceded at oral argument that the record contained no evidence that either ALJ Sullivan or Mr. France, who was responsible for the March 7, 2005 denial, harbored any racial animus toward plaintiff, with the exception of a single sentence in an email written by Mr. France on September 9, 2005. The email described the current status of plaintiff's August 2005 grievance, provided instructions on how to deal with her contemporaneous absences, and offered advice on counseling her on her attendance when she returned to work. At the conclusion, Mr. France stated, "Keep smiling. . . . if it was easy it wouldn't be any fun," which, plaintiff asserts, establishes Mr. France's racial animus because it demonstrates "how [Mr. France] enjoy[ed] . . . putting the plaintiff through this." Hrg. Tr. 9 (July 24, 2013). This solitary statement, however, is devoid of any racial content and thus provides no evidentiary support for the claim that plaintiff's reasonable accommodation denial or termination was tainted by intentional race discrimination. Defendant has presented unchallenged evidence that plaintiff's termination was the result of standard operating procedures following her year-long absence from the office. While plaintiff contends this is mere pretext, she is unable to point to any specific actions by either Mr. Wulkan or Ms. Sullivan that unlawfully influenced the decision to deny the reasonable accommodation request or terminate plaintiff's employment. No reasonable jury would find that the reasonable accommodation denial or termination was the result of intentional discrimination.

### ii. Hostile Work Environment

To make out a *prima facie* case of hostile work environment, a plaintiff must show: (1) that the harassment was sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer. *See Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks omitted). Isolated incidents usually will not suffice to establish a hostile work environment, although a single episode of harassment might establish a hostile work environment if the incident is sufficiently "severe." *Redd v. New York Div. of Parole*, 678 F.3d 166, 175-76 (2d Cir. 2012).

At oral argument, plaintiff's counsel stated that Mr. Wulkan ceased making allegedly racist jokes around October 2004. Therefore, this claim is time-barred in accordance with the discussion above. Moreover, plaintiff's hostile work environment claim fails on the merits. The record contains no evidence regarding the substance of Mr. Wulkan's jokes, or whether they were directed at plaintiff personally. There is also no evidence that racial animus drove Mr. Wulkan's close supervision of plaintiff, which plaintiff herself characterized as a "nuisance," or the September 1, 2004, postage machine incident. Even considering all the evidence together, there is insufficient evidence for a reasonable jury to conclude that plaintiff's workplace was permeated with abusive, race-based hostilities. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (internal quotation and editing marks and citations omitted).

For these reasons, plaintiff's Title VII disparate treatment claims are dismissed.[7]

Finally, plaintiff suggests in a footnote that defendants have not moved for summary judgment regarding plaintiff's claims national origin discrimination. This is incorrect; defendants' Notice of Motion requests "summary judgment in defendants' favor dismissing the Amended Complaint." Plaintiff's declaration states that she is "of African descent," but does not identify her national origin. Other than this footnote, plaintiff makes no argument as to why national origin and race should be treated differently for the purposes of this motion, and she has pointed to no factual basis for treating the claims as distinct here. Therefore, plaintiff's national origin discrimination claims are dismissed for the same reasons.

### c. Title VII: Retaliation

Title VII prohibits an employer from retaliating against an employee for, among other things, complaining of employment discrimination prohibited by Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Retaliation claims under Title VII are governed by the same burden-shifting framework laid out in *McDonnell Douglas*. *Summa v. Hofstra University*, 708 F.3d 115, 125 (2d Cir. 2013). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer was aware of that activity; (3) the employer took a materially adverse action; and (4) a causal connection exists between the adverse action and the

---

[7] Because defendants' motion is granted on the grounds discussed above, it is unnecessary to address their argument that plaintiff's adverse job action and hostile work environment claims were not properly exhausted.

protected activity. *See Kelly v. Howard I. Shapiro & Assoc. Consulting Engs.*, P.C., 716 F. 3d 10, 14 (2d Cir. 2013). Under a recent decision of the Supreme Court, in making out the causal connection, a plaintiff must show that the desire to retaliate was not just a motivating factor, but was the "but-for" cause of the challenged employment action. *University of Texas Southwestern Medical v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

Even assuming for the purposes of this motion that a jury could find plaintiff engaged in protected activity, that is, that the October 8, 2004 complaint encompassed an allegation that plaintiff's treatment was based on her race, no reasonable jury would find that defendants retaliated against plaintiff.[8] The materially adverse action that she complains of—the notice that a modification to her schedule was imminent—occurred on September 15, 2004, the month *before* she engaged in protected activity. No reasonable jury would find the two events causally connected.

Nor would a reasonable jury find that the March 7, 2005, reasonable accommodation denial was causally connected to the October 8, 2004 complaint solely by reason of the passage of time of nearly five months. *See, e.g., Perry v. NYSARC, Inc.*, 424 F. App'x 23, 26 (2d Cir. 2011) (four-month interval insufficient in itself to establish the causal connection necessary to support a retaliation claim). And plaintiff offers nothing else to connect the two events; her argument that Mr. France's requests for additional medical information to evaluate her reasonable accommodation request constitutes additional, continuous activity of discrimination is rejected. No reasonable jury would infer from these requests the but-for causal connection between the October 8, 2004 grievance and the March 7, 2005 reasonable accommodation denial

---

[8] Plaintiff's assertion that her earlier objections to Mr. Wulkan about the racial content of his jokes constituted protected activity is not supported by evidence in the record, such as the timing or content of these objections.

15

that plaintiff must establish. *Nasser*, 133 S. Ct. at 2528. Plaintiff's claim linking her December 2006 termination to the October 2004 complaint is doomed by the same infirmities.

### d. ADA: Hostile Work Environment, Failure to Provide Reasonable Accommodation, and Retaliation

Plaintiff alleges that the individual defendants subjected her to a "discriminatory hostile work environment on account of her disability" and retaliated against her, including terminating her, because she complained of discriminatory treatment and the lack of reasonable accommodation.

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Finally, Title V provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . ." 42 U.S.C. § 12203(a).

The Second Circuit has held that the retaliation provision of the ADA does not provide for individual liability. *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010). Although *Spiegel* did not address individuals sued in their official capacities, numerous district courts in this circuit have persuasively held that there is no individual liability under Title I or Title II of the ADA, regardless of whether the claim is brought in an individual or official capacity. *See, e.g., Fox v. State Univ. of New York*, 497 F. Supp. 2d 446, 451 (E.D.N.Y. 2007); *Sutherland v. New York State Dep't. of Law*, 1999 WL 314186, *7 (S.D.N.Y. 1999). Plaintiff has offered no persuasive

reason to conclude otherwise with respect to Title V of the ADA. Because the plaintiff's only remaining ADA claims are brought against the individual defendants, and no such liability is available under the statute, these claims must be dismissed.

In any event, and even assuming injunctive relief could be had against the individual defendants, plaintiff was not terminated by either Mr. Wulkan or ALJ Sullivan, and the record does not establish that their respective positions at DMV were endowed with the authority to grant plaintiff the injunctive relief she seeks. For these reasons, plaintiff's claims under the ADA are dismissed.

### e. 42 U.S.C. §§ 1981 and 1983: Retaliation and Hostile Work Environment

In these claims, plaintiff alleges the individual defendants retaliated against her after she complained about racially discriminatory treatment and that they subjected her to a discriminatory hostile work environment because of her race, in violation of § 1981.

Defendants' argument that plaintiff's § 1981 claims should be dismissed because the complaint does not include reference to 42 U.S.C. § 1983 is unpersuasive. To be sure, § 1983 creates "the express cause of action for damages" that "constitutes the exclusive federal remedy for the violation of rights guaranteed in § 1981 by state governmental units." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 733 (1989); *see also Westbrook v. City of New York*, 591 F. Supp. 2d 207, 223 (E.D.N.Y. 2008) (applying holding in *Jett* to individuals sued in their individual or official capacities). At oral argument, however, defendants were unable to articulate any prejudice that would result from reading a § 1983 claim into plaintiff's complaint or allowing her to amend to add it. It would be unduly harsh to dismiss plaintiff's claim on this ground when defendants made no prior motion to dismiss, the flaw could easily be overcome by a straightforward amendment to the complaint, and treating the claim as arising under § 1983

does not modify the substance of her claim. Therefore, the court will treat plaintiff's claims as § 1981 claims arising under § 1983.

Turning to the merits of her § 1981 claims, the same factual allegations that form the bases of plaintiff's hostile work environment and retaliation claims under Title VII also form the bases of her claims under § 1981.[9] While plaintiff asserted Title VII claims against the DMV, the claims under § 1981 are asserted only against the individual defendants.[10] Because the Title VII and § 1981 allegations are factually and analytically the same for the purposes of this motion, plaintiff's hostile work environment and retaliation claims under § 1981 fail for the reasons stated above. *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004). Therefore, the plaintiff's § 1981 claims are dismissed.

### f. FMLA

At oral argument, plaintiff conceded that she was no longer pursuing her claims under the FMLA. 29 U.S.C. § 2601 *et seq.* Therefore, these claims are dismissed.

### g. New York State Human Rights Law and New York City Human Rights Law

As discussed above, the claims over which this court has original jurisdiction have been dismissed. Therefore, I decline to exercise supplemental jurisdiction over plaintiff's remaining state and local law claims. 28 U.S.C. § 1367(c)(3).

---

[9] Neither plaintiff's complaint nor her opposition brief make mention of a claim for an adverse job action under § 1981.

[10] To the extent that plaintiff asserts her § 1981 damages claims against the individual defendants in their official capacities, such claims are barred by the Eleventh Amendment because § 1983 did not abrogate the states' sovereign immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989). And any claim for injunctive relief is not supported by the record. *See infra*, p. 17.

## III. CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly.

                                                 **SO ORDERED.**

                                                 s/Nina Gershon

                                                 **NINA GERSHON**
                                                 **United States District Judge**

Dated: August 2, 2013
       Brooklyn, New York